Argued April 11, affirmed as to defendant bank, reversed as to the other defendants July 23, rehearing denied October 1, 1929.

JAMES T. LOGAN *v.* GRANTS PASS & JOSEPHINE BANK AND SOPHIA GILMORE, ADMINISTRATRIX OF THE ESTATE OF J. T. GILMORE, DECEASED.

(279 Pac. 528; 280 Pac. 877.)

532

For appellant there was a brief and oral argument by *Mr. Gus Newbury.*

For respondent Grants Pass & Josephine Bank there was a brief and oral argument by *Mr. O. S. Blanchard.*

For Sophia Gilmore, Administratrix, there was a brief and oral argument by *Mr. A. C. Hough.*

BEAN, J.—The amount in dispute is mingled to a certain extent with road contract construction amounting to some $165,000. We have stated the main facts which seem to have bearing upon the issues in this suit. Only the contract of G. & C. with Albert Anderson for the production of 30,000 cubic yards of crushed rock at the bunkers is really involved in this suit.

After the operation, under the 30,000 yard contract had proceeded for a time, the highway department advised the installation of a second crusher.

The crusher near Drain was moved so as to make a much shorter haul and it was estimated that by such move $10,000 would be saved in hauling. The hauling of the crushed rock was done by Anderson, the original contractor. Logan advised Anderson that on account of such saving Anderson should pay the bank $2,000, to be credited on G. & C.'s notes. A contract was drawn in August, 1920, subletting the balance of the rock crushing by Logan to one H. H. Russell at $1.65 per yard consented to by G. & C. containing the following provisions.

"And the party of the fourth part (Albert Anderson) in consideration of the benefits accruing to him by the installation and the operation of the rock crusher hereinbefore described, hereby agrees to pay the sum of $2,000 to the Grants Pass Banking Company at Grants Pass, Oregon, to be credited upon the notes of the parties of the third part now held by said

bank; and hereby consents to the covenants and agreements between the party of the first part and the party of the second part, hereinafter contained."

This contract was signed by Logan, Russell and G. & C., but Anderson refused to execute the same. The writing appears to have served as between Logan and Russell, his subcontractor, but never was completed and never became effective as to the $2,000 proposition.

The testimony does not show that Logan ever promised to pay G. & C. or Gilmore $2,000 or any sum for releasing their or his interest in the Yoncalla or Upper Crusher works or contract. This defendant has not sustained the burden of proof in this respect. It is in direct opposition to the written contract of December 1, 1919, between Logan and G. & C.

Mr. G. M. Raymond, the official reporter, was appointed by the court as referee. A portion of the testimony was taken before him as such referee and a portion thereof was taken before Mr. W. J. Looker, reporter *pro tem.;* the finding of G. M. Raymond, referee, shows in effect, that J. T. Logan in taking over and operating the contract calling for the getting out of 30,000 yards of rock, after paying all expenses in connection therewith, had a surplus or profit of $2,426.37. This finding was more particularly set forth in schedule "A" attached, and contains the following totals:

Revenue: 30,000 yards of rock at $1.65 per
    yard ..................................$49,500.00
Payrolls & miscellaneous expend. as shown
    by cancelled checks .................. 47,073.63

Making surplus or profit of ...$2,426.37

Mr. Looker, as an accountant after the testimony was taken before him as reporter *pro tem.,* reported

that the total expenditure, as shown by the referee's report, should be increased as follows:

"Total expenditures shown by the referee $47,073.63
Add items which are properly included in
    No. 12 ...................$7.577.83
Add No. 11 ........$2,000.00
Less sale of elevator
    and screen ...... 750.00  1,250.00
Add defendant's Ex. D and E ....420.00

            Total additions ............. 9,247.83

Which would bring total expenditures to..$56,321.46"

The report of W. J. Looker, so corrected, shows in detail all of the transactions under the contract, expenses for labor and supplies and sums paid out by checks, or otherwise, by G. & C. up until January 1, 1920, and also thereafter under the management of Logan, with G. & C. supervising a portion of the work. The report is too lengthy to summarize. The total expenditures and credits relating to the crusher at Drain are:

Total expenditures ....................$46,595.40
22,499 yards at $1.65 per yard ........... 37,123.35
Loss, Drain crusher .................... 9,472.05
    And at Yoncalla—
Total expenditures ....................$15,720.12
7,500 yards at $1.65 .................... 12,375.00

Loss Yoncalla crusher ................. 3,345.12
Loss both crushers ....................$12,817.17"

We do not understand that the court adopted either of the reports to which we have referred so far as the claim of G. & C. is concerned. In regard to the Gilmore claim, the court found, in part, as follows:

"The court finds that there was necessity for an accounting for the purpose of determining whether a profit was made from the operations of the Drain

quarry by the plaintiff, Logan, between December 1, 1919, and the termination of the contract, as fulfilled through the operation of the Drain quarry and crusher and the plaintiff, Logan, made a profit from such operations. That such operations were carried on in an extravagant manner, and that any showing of loss is overcome by the extravagance in the operations of the plaintiff and the court further finds that any loss claimed by the plaintiff, Logan, was overcome by the extravagant and unwarranted expenditure on account of his operations and the payment to him of $4,980.00 by Albert Anderson and the plaintiff's retention of $2,027.83, the same, being the difference between the amount due Gilmore and Childers from the State Highway Commission, to wit: $6,577.83, and $4,550.00 thereof applied by the plaintiff to the retirement of the Gilmore and Childers' notes for $3,000.00 and $1,250.00 and his failure to pay the defendant, Gilmore, wages agreed upon and his attempt to charge for the loss on account of powder amounting to $2,233.00 and other numerous items not properly chargeable to the plaintiff's operations of the Drain quarry and that there was no actual loss on account of such operations.''

We are unable to concur in the above finding of the learned trial judge. G. & C. were deeply in debt to the bank after running the contract business for comparatively a short time. It is plain from the record that they were unable to further carry on alone. Logan as surety for Anderson was interested in a successful termination of the whole construction. At the request of the bank and with the consent of G. & C. he took over the work of completing the G. & C. contract work. Nevertheless he retained both Gilmore and Childers as foremen, and their experience and skill, together with Logan's management of the financial end of the business, and in a general way of the

operation, he being on the ground occasionally, combined to carry on the contract.

In letting the contract for quarrying to the Austrians and other subcontractors, it appears he acted in entire good faith and did the best he could. Whatever contract, or how low a price was named to a subcontractor, the labor and running expenses had to be first paid by him. All this was done with G. & C. on the work nearly all of the time and there was no apparent murmur of complaint from either of them.

■ To make a general finding of extravagance to wipe out a loss and show a profit for Gilmore is not borne out by the record. When bills were presented to Logan for labor, supplies, hardware, powder, parts for machinery and the like, furnished for the work he was compelled to and did pay them. This he could do at the time or pay more at the end of lawsuits, and Gilmore had no reason to complain. Logan and Gilmore settled the accounts between them. Both made a statement to the other. The law favors such a settlement. Gilmore was as well acquainted with all the transactions as Logan was and ought to have known more about the work than Logan. They appeared to be satisfied until brought into court by the bank. We think Logan and Gilmore were in a better position to settle and adjust their accounts when the matters were fresh in their minds and could arrive at a better result than any court can after years have elapsed.

Mr. F. C. Bramwell, the then cashier of the bank, testified that it was the understanding that Logan would pay the G. & C. notes but there is no testimony to show that Logan ever stated that he would be responsible for such notes, except from the proceeds

of the contract. This is material as to the claim of Gilmore's estate, if not as relating to the bank.

Logan brought action against G. & C. and obtained judgment on their note. They made no defense. They had their day in court. This is not a suit to set aside that judgment. Neither Gilmore nor the firm of Gilmore & Childers is entitled to any equitable relief against Logan.

It was very easy for Mr. Gilmore, and is for anyone, where work like this is being done, after the plant is installed and everything is running smoothly, to make a rough estimate without taking into consideration the many items of necessary expenses and figure out on paper a profit.

Gilmore has no legal or equitable claims against Logan on account of the certificate of deposit or security given by him to the bank. Such claim is preposterous. Logan, as shown by the testimony, never promised or agreed with either G. & C. or undertook in any way to pay the notes of G. & C. to the bank except as he received the money from the proceeds under the rock contract.

Gilmore claims $1,233 against Logan which was allowed by the trial court by reason of loss on account of powder. Black powder was purchased and after drilling a large hole in the rock quarry in the shape of a "T," this enormous quantity was loaded therein and fired, and while it was enough to make one tremble, it failed to take effect. This was not the fault of Logan and he was compelled to pay for the powder. This was not the first blast with powder that failed to function. Afterward giant powder was used. Gilmore had no reason to complain in this regard. All of the rock operations were carried on by Logan in the usual and businesslike manner and in

good faith. There is not one dishonest transaction on his part shown by the evidence.

Whether all the money drawn from the bank by G. & C. went into the works is a question. It is stated they had another contract. There was a large loss on the machinery purchased by G. & C. Everyone knows that a used car or any kind of machinery depreciates rapidly. It would seem that it was fortunate that there was as much realized on the old machinery as there was.

■ Taking up the matter between plaintiff Logan and the defendant bank, it involves, among other things, a construction of the written contracts. We are not certain that our views will harmonize with those of counsel on either side, or of the learned circuit judge.

The contract between G. & C. and Albert Anderson for producing 30,000 cubic yards of crushed rock was made and dated August 9, 1919, and contained the following clause:

"All sums of money to which the first parties (G. & C.) shall be entitled the second party shall pay into the Grants Pass Banking Company at Grants Pass, Oregon, to the credit of the first parties."

The contract of August 11, 1919, between G. & C. and the bank stipulated in part, as follows:

"It is mutually agreed by and between the said J. T. Gilmore and F. F. Childers, as parties of the first part, and the Grants Pass Banking Company, as party of the second part, that the said parties of the first part will transmit for their credit to said bank all moneys received by them under their contract and apply so much of the proceeds upon their note, or notes, as will not be actually required to meet current bills and payrolls during their operations in the production of said crushed rock until the full sum of

their obligations to said bank has been fully discharged, * * "

The contract of December 1st, 1919, between Logan and G. & C. consented to by Anderson provided that any profits realized after paying all expenses of completing the 30,000 yards of rock contract, and the indebtedness to the bank, should be paid to G. & C.

A further provision is made by the contract, that if sufficient money had not been realized to pay all expenses and the indebtedness due the bank, then the equipment used in connection with the work should be sold for such purposes, overplus, if any, to be paid to G. & C.

Logan assumed G. & C.'s contract and agreed to continue to completion in accordance with the terms of the contract of August 9, 1919. The contract of December 1, 1919, as will be seen above, contains the following:

"It is further agreed by and between the parties hereto that all moneys becoming due the party of the first part (Logan) under said agreement of August 9, 1919, as hereinafter modified, shall be paid to the Grants Pass Banking Company of Grants Pass, Oregon, under the terms of the agreement between the parties of the second part and said banking company, entered into on the 11th day of August, 1919."

According to the contract of August 11, 1919, between G. & C. and the bank, all sums paid by the state for the credit of G. & C. not "actually required to meet current bills and pay-rolls" should be applied upon the G. & C. notes. The plain requirement of the contracts was that all rock proceeds not immediately necessary to pay for labor and like bills should be applied on the G. & C. note. The contract of G. & C. with the bank demanded this and the

assignment contract G. & C. to Logan called for the same thing.

Bluntly expressed, the time to square up the G. & C. obligation to the bank was December, 1919, or as soon as the money was received for the work already done by G. & C. The bank was not required to wait until the rock contract was completed to ascertain if there would be money available belonging to G. & C. to pay their notes. It was not contemplated, as shown by the writings and the whole plan, that the bank should be deferred until the machinery and all other indebtedness should be paid. Logan, soon after he took over the contract received as the proceeds of the rock crushed by G. & C. prior to that time the sum of $6,577.83, he paid the bank for G. & C. one note, $3,300, and another $1,250, leaving a balance available to be paid to the bank on G. & C. notes of $2,027.83, which was sufficient to satisfy the notes of G. & C. to the bank.

The testimony tends to show that Logan was permitted by the bank to use the money for a time. It was thot by the interested parties during a portion of the time of the operations until a certain decision was rendered by this court that as Logan was the surety for Anderson, he was liable for G. & C. as Anderson's subcontractors.

We do not understand that the referee or accountant exactly balanced up the G. & C. account to December 1, 1919, or January 1, 1920. We feel that this is an equitable adjustment. An exact figure to that time cannot be obtained. There was rock quarried, not crushed. The quarry had been stripped and one plant installed at a cost of about $1,400, a portion of which expense should equitably be borne by or charged to the later operations. We have care-

fully read all of the testimony and considered several points not mentioned in this memorandum on account of space. We regret that at the closing of the rock contract the evidence shows a large loss.

Therefore the decree in favor of the Grants Pass and Josephine Bank and against plaintiff J. T. Logan is affirmed.

The decree in favor of Sophia Gilmore, administratrix of the estate of J. T. Gilmore, deceased, is reversed and the cross-complaint of this defendant is dismissed.

AFFIRMED AS TO DEFENDANT BANK. REVERSED AS TO OTHER DEFENDANTS.

Coshow, C. J., and Belt, J., concur.

Brown, J., took no part in the consideration of this case.

---

Rehearing denied October 1, 1929.

ON PETITION FOR REHEARING.

(180 Pac. 877.)

REHEARING DENIED.

For appellant, *Mr. Gus Newbury.*

For respondents, *Mr. O. S. Blanchard* and *Mr. A. C. Hough.*

BEAN, J.—In a petition for a rehearing filed on behalf of the plaintiff and appellant it is contended, in effect, that in December, 1919, there were not funds enough available to pay Gilmore and Childers' notes

to the bank in the hands of, or under the control of plaintiff Logan from the proceeds earned by Gilmore and Childers in executing the rock crushing contract. In the former opinion, *ante*, p. 530, relating to the case between plaintiff Logan and the defendant bank, after quoting a part of the contract of assignment wherein Logan assumed the Gilmore & Childers contract and agreed to continue the same to completion, in accordance with the terms of the contract of August 9, 1919, wherein the plaintiff agreed that all moneys becoming due him under the agreement of August 9, 1919, as modified, should be paid to the Grants Pass Banking Company, under the terms of the agreement between the parties of the second part, Gilmore and Childers and the bank, all sums paid by the state for the credit of Gilmore and Childers, not "actually required to meet current bills and pay-roll," should be applied upon the Gilmore and Childers' note; the plain requirement of the contract was that all rock contract proceeds, not immediately necessary to pay for labor and like bills, should be applied on the Gilmore and Childers' note; we stated "the contract of Gilmore and Childers with the bank demanded this and the assignment contract of Gilmore and Childers to Logan called for the same thing."

Not only were the proceeds earned by Gilmore and Childers, excepting immediate running expenses and labor bills, required to be applied on the Gilmore and Childers' note due the bank, but by the plain terms of the agreement, Logan was required to apply the proceeds of the contract in the same manner after he took over the work. The memorandum, as to the time of adjusting the Gilmore and Childers

obligations to the bank, in order not to be misunderstood, should be amplified so as to read as follows:

The time to square up the Gilmore and Childers' obligations to the bank was December, 1919, or as soon as the money was received for the work already done by Gilmore and Childers; or if at that time there were not sufficient funds available from the Gilmore and Childers contract, as soon thereafter as funds were available for that purpose from the rock-crushing contract operations which were assumed by Logan and continued by him. That is the meaning of the stipulation contained in the contract of December 1, 1919, wherein Logan agreed that all money becoming due to the party of the first part (Logan) under said agreement of August 9, 1919, as modified, should be paid to the Grants Pass Banking Company. Therefore, as we heretofore stated, the bank was not required to wait until the rock contract was completed to ascertain if there would be money available belonging to Gilmore and Childers to pay their notes.

■ It is not contemplated, as shown by the writings and the whole plan, that the bank should be deferred until the machinery and all other indebtedness should be paid. Undoubtedly if the plaintiff did not receive sufficient amount from the proceeds of the Gilmore and Childers contract due Gilmore and Childers December, 1919, he did receive sufficient funds thereafter which were not immediately necessary to meet current bills and pay-rolls. Such was the stipulation made by Gilmore and Childers in their contract with the bank and plaintiff Logan assumed that contract and agreed to carry it forward and it was incumbent upon him to carry it forward in the same manner as Gilmore and Childers had agreed to do.

The obligation of the bank, in furthering the assignment by Gilmore and Childers to Logan and which Logan agreed to, was to have someone proceed with the execution of the contract who would carry out the terms thereof and apply the proceeds not actually required to meet current bills and payrolls on the Gilmore and Childers notes.

Instead of doing this, the record, as we understand it shows Logan paid large sums for machinery, which he desired to use, and many other expenses, and left the amount, included in the decree due the bank, which should have been paid first after the payment of current bills.

Therefore, whether the figures relating to the Gilmore and Childers proceeds received by Logan in December, 1919, were accurate or not, undoubtedly he thereafter received sufficient funds as proceeds from the rock-crushing contract to pay the balance of the Gilmore and Childers notes to the bank.

The equities are with the defendant bank. Plaintiff Logan, under the terms of his agreement, and as the execution of the rock-crushing contract developed after Logan assumed the contract and proceeded with the work, was required to pay from the proceeds thereof obtained by him, the balance of Gilmore and Childers notes due the bank. Not only the written contracts show this, but Logan's acts in paying a part of the notes and the interest thereon; and as claimed by the bank, his request that the payment of the notes be deferred for a time for his convenience, all confirm the agreement and understanding.

With this explanation the petition for rehearing will be denied. REHEARING DENIED.